Shrewsburry, Alvis  
DOB: 09/30/1976  
OID 3419295  
Southern Regional Jail and Correctional Facility

Independent Medical Expert Report for the Plaintiff
Miranda Dawn Smith on behalf of the Estate of
Alvis Ray Shrewsburry
January 15, 2024

A. Materials Reviewed

I have review the following materials in developing my opinions in this case:

1. Autopsy report, Death Investigation Report, Toxicology Reports, Office of the Chief Medical Examiner, State of West Virginia, OCME Case 22-6566, September 17, 2022.
2. Medical records, Wexford Health, Jail Intake Questions, August 29, 2022.
3. Full Patient History, Medications, Vital Signs, Medical Sick Calls, March 04, 2021 to September 18, 2022
4. Medical Records, The Medical Centers of the Mountains, Appalachian Regional Healthcare, Emergency Room Records, Geary, Mark, DO, September 17, 2022
5. WVDOCR Report of Investigation, Trina McKinney, Investigator, Initial report January 6, 2023, new format, July 19, 2023
6. Incident Report DCR 00447289, Walls, Ryan, September 17, 2022
7. Incident Report DCR 00447287, Jarrell, Aiden, September 17, 2022
8. Incident Report DCR 00447267, Radosevich, Jonah, September 17, 2022
9. Incident Report DCR 00447282, Williams, Jared, September 17, 2022
10. Incident Report DCR 00447275, Blake, Jenna, September 17, 2022
11. Incident Report DCR 00447279, Waugh, Beth (LPN Tiffany Mullins), September 17, 2022
12. Incident Report DCR 00447276, Waugh, Beth (Staci Perry), September 17, 2022
13. Pictures provided in email correspondence Williams, Jared to Jayme S Martin, September 17, 2022
14. Written statement from inmate Brandon Lambert, September 20, 2022

EXHIBIT A

15. Wexford Health Morbidity Survey Report, October 13, 2022
16. Deposition testimony of Mark Geary, II, D.O. from his deposition on October 26, 2023
17. Deposition testimony of Erica Lee Wade (formally Sizemore), LPN from her deposition on December 01, 2023
18. Deposition testimony of Tiffany Mullins, LPN from her deposition on December 13, 2023
19. Deposition testimony of Paul Mellen, M.D. from his deposition on January 04, 2024
20. Plaintiff's Complaint, Case 5:23-cv-00210, March 15, 2023
21. Answers to Plaintiff's Complaint, WV Division of Corrections and Rehabilitation, April 27, 2023
22. Answers to Plaintiff's Complaint, WV Division of Corrections and Rehabilitation, Def Wexford Health, Ashley Stroup, LPN, Beth Waugh, LPN, Erica Wade LPN, April 28, 2023.

I reserve the right to supplement the materials I have reviewed in rendering my opinions.

**B. Qualifications, List of Cases, and Fee Schedule**

I am a physician licensed to practice medicine in the state of North Carolina, Washington, Arizona, Texas, Michigan, Indiana, Illinois, Kentucky, Mississippi, South Carolina, Louisiana, Missouri. I am Board Certified in Internal Medicine and have practiced medicine without lapse or blemish since 2011. I have in-depth knowledge of medical care provided to incarcerated individuals.

A copy of my CV including my last 10 years of publications is attached to this report as Exhibit A. A list of the cases I have worked on is attached as Exhibit B. My fee schedule is attached as Exhibit C. I charged $300 per hour to review medical charts and $5,500 per one day deposition.

**C. Summary of Records and Testimony**

The facts are inmate Alvis Shrewsburry presented to jail on 8/29/2022, incarcerated for Driving Revoked for DUI 2nd. Intake urine drug screen was positive for methamphetamines, THC and fentanyl. His intake vitals were blood pressure reading of 127/87, pulse of 82, respiratory rate of 17, temperature 97.8, oxygen saturations at 97%. Intake review of systems were check marked "yes" for "Incoherence R/T ETOH/DRUGS and Withdrawal from CTOH/DRUGS", with no specificity for substance in question. There was no chest pain, shortness of breath or difficulty breathing, no trauma. There was no mention of diarrhea, vomiting, nausea, or muscle pain. Medications were provided for 3/4/2021 (presumably a previous incarceration) as well as 8/29/2022 (current incarceration). There is a history of alcohol abuse and opioid addiction. Previously, the inmate was prescribed clonidine tablets of various strengths three times a day, Pepto-Bismol twice a day as needed, Zofran three times a day as needed. During the current incarnation, 8/29/2022, the inmate was prescribed bentyl three times a day as needed, ibuprofen 600 mg three times a day as needed for muscle aches, Zofran twice a day as needed, clonidine three times a day at various doses, diphenhydramine nightly, bismuth liquid twice a day as needed, as well as multivitamins and folic acid. Vital signs on 9/3/2022 notable for blood pressure of 130/72, pulse of 69, respiration of 18, saturations at 97%. There was one documented sick call on 9/3/2022 when the inmate was seen for a rash on the right shoulder/chest and treated (Barbara Maynor). Bismuth is noted

to have "never been taken".  It is not clear if the other medications ordered were dispensed and administered.

The inmate was noted to have a black eye during a medication pass on 9/6/2022 by LPN Corkrean.  The nurse had asked the inmate if an altercation occurred and the inmate denied an occurrence.  The inmate state he fell out of bed.  It is reported the nurse made the inmate an appointment to see the jail physician.  The inmate was moved to C-5 on 9/10/2022 and an x-ray was ordered 9/11/2022, approved the following day and performed on 9/13/2022.  This chest xray did not show evidence of fracture.  On 9/14/2022, a physician exam was deferred given the negative x-ray.  On 9/16/2022, LPN Corkrean asked after the inmate to see about his health.  The inmate stated he felt fine.  Collateral information from cell mates indicate the inmate had been complaining of "stomach pain and hurting in his ribs and his side" the week prior to his death.

On 9/16/2022, the inmate was noted, on video surveillance, to have fallen in C16 with his legs seen at the entrance of the cell.  Witness reports indicate that prior to this incident, the inmate complained of not feeling well and needed to have a bowel movement.  Approximate 5 minutes past midnight, a call by another inmate was put through asking for medical assistance to the cell for an inmate who had passed out.  A member of the medical team, Staci Perry, and a custody officer, officer Radosevich, dispatched to the cell to find the inmate on the toilet, helped up there by another inmate who was splashing water on his face.  Mr. Shrewsburry was coherent then and could answer questions asked by medical staff.  The inmate had complained of chest pain, trouble breathing and feeling like he needed to have a bowel movement.  The inmate was noted by custody to be gray but responsive.  More medical staff came to aide and assess.  Vital signs taken by nurse Mullins was notable for a blood pressure of 140/74, pulse of 45 and an oxygen saturation of 86%.  A decision was made by medical, nurse Mullins, to send the inmate to the hospital.  EMS was summoned.  The inmate was transitioned to a wheelchair.  When assisted up to the wheelchair, the inmate was noted to have had bloody diarrhea.  Nurse Mullins attempted to contact Jail Medical Doctor and on her third try, got a hold of Dr. Martin who instructed medical to send the inmate to the emergency room.  The decision was made to transition the inmate to the Booking cell where it was decided he would be assisted to the shower and clean himself before EMS arrived.  No medical personnel appeared to have accompanied the officer or the sick inmate to the Booking cell.  The officer who accompanied the inmate to the Booking cell left the inmate to clean up while the officer left to retrieve an adult diaper.  When he returned, inmate was found on the ground.  Although breathing and with a pulse, the inmate was unresponsive.   Nurse Mullins was again summoned and vital signs were taken.  The blood pressure could not be measured; the inmate was bradycardic at 35 beats per minute. Oxygen saturations were 76%.  Shortly after, at 0040, the inmate lost a pulse.  ACLS protocol was started. EMS arrived and continued ACLS protocol, transitioning the inmate onto a gurney, then ambulance and ultimately to the emergency room where CPR was continued for another 40 minutes before the code was called.

Pictures of the inmate's cell, as well as pictures from the Booking cell, had evidence of copious blood in and around the toilet bowl, on the cell floor, on the mattress where he fainted, on the floor of the Booking cell.

On autopsy, the medical examiner found healing racoon ecchymosis of the left orbit without fractures.  Grossly, the body had no signs of trauma.  There was an enlarged heart weighing 500 grams, with normal arteries, and left ventricular hypertrophy, lungs were unremarkable, the stomach with evidence of hemorrhagic mucosa filled with digested blood and intestines with melenic content.  The esophagus was unremarkable.  The liver and its ducts were unremarkable.  The spleen was unremarkable and the

kidneys were pale and smooth with microscopic mild chronic inflammation.  A toxicology report was negative for alcohol or drugs.  The manner of death was determined to be natural from acute and chronic upper gastrointestinal bleeding with contributory factors to include cardiomegaly.

**D. Expert Opinions**

I hold the following opinions regarding Alvis Shrewsbury's care, while incarcerated at Southern Regional Jail and Correctional Facility, to within a reasonable degree of medical certainty:

1.  There was evidence of cardiomegaly and left ventricular hypertrophy on autopsy

2.  There was no evidence of external trauma on the body by witness accounts (jail medical staff, ER MD) and on autopsy

3.  The decedent had a history of alcohol abuse

4.  The jail prescription history paints a picture of the treatment for possible gastrointestinal ailments such as abdominal pain or cramping, diarrhea, nausea.  This could also be pre-emptive treatment for opioid withdrawal from abstinence when seen in relation with prescribed clonidine

5.   The inmate had stated to a fellow inmate he had abdominal pain and rib pain a week prior to the death.  This is over shadowed by possible assault in jail

6.  Ibuprofen 600 mg was prescribed to this inmate with a history of alcohol abuse.  It is unknown if any of this were dispensed and administered, given no MAR (Medication Administration Record) was provided for review

7.  The inmate was noted to have a black eye; medical staff had concerns it was an injury relating to something other than failing out of bed but failed to bring this to the attention of the medical doctor on duty or had the inmate accessed for injuries

8.  The deposition of LPN Erica Lee Wade (formally Sizemore) revealed the inmate was brought to medical on or about 12:20 PM, 09/16/2022, by an officer.  The LPN stated in her testimony that  the inmate appeared to be detoxing and had snot coming from his nose.  The inmate was sweaty and pale.  The inmate stated he was detoxing and the LPN ordered Pepto-Bismol per detoxing protocol.  The LPN testified she did not know what the inmate would be detoxing from.  Vital signs were said to have been obtained and were normal.  The LPN testified this was the reason the inmate was not brought to the attention of the facility medical doctor.  The LPN testified the visit was not documented in the jail EMR.

9. During the deposition of LPN Tiffany Mullins, the LPN acknowledged the inmate had complained of chest pains.  The LPN stated Wexford's chest pain policy or protocol would be to perform an EKG; none was performed given the inmate had blood and feces coming out of him.  The nurse testified the inmate had other symptoms that needed to be assessed immediately by emergency medical services.  The testimony revealed a significant time lag in summoning such services.  It also revealed the inmate did not receive any supplemental oxygen during the time he was assessed in the cell, en route to and while in the Booking cell, although oxygen saturations were noted to be at 76% and the heart rate was 45.

10. On autopsy, there was evidence of acute and chronic gastrointestinal bleeding without signs of esophagitis

11. The inmate had obvious signs of hypotension in the setting of active GI bleeding in his cell when he was found collapsed earlier in the evening before he expired

12. The inmate was clinically unstable to be transported by wheelchair

13. The inmate was clinically unstable to be sent to clean himself in preparation for EMS to arrive

14. The inmate was not accompanied by medical staff while a custody officer took him to clean up before EMS arrived

15. The inmate was left alone in the Booking cell, after which, he was found collapsed on the floor

16. It is my opinion that there was a failure to recognize a life threatening medical emergency in evolution and to act appropriately and expeditiously

17. It is my opinion there was a lapse in medical acumen the 14 hours prior to the decedent's medical emergency declaration, when the decedent presented sweaty and pale to be assessed by medical, that if it were brought to the attention of a medical doctor, the ensuing medical emergency could have been averted

18. It is my opinion that there were breaches of the standard of medical care by the medical staff taking care of the inmate the night he collapsed. The standard of care dictates that any patient considered unstable in the setting of a GI bleed, represented by loss of consciousness and/or syncope, thready pulse, orthostasis, ashen facies, chest pain and shortness of breath, should not have been moved in a wheelchair, but stabilized in place or transported via gurney to a place where medical stabilization can occur, such as the infirmary. Certainly, the unstable GI bleeding patient should not be made to clean himself while waiting for EMS to arrive.

19. It is my opinion this dereliction of duty to recognize an impending emergency, to provide emergency care according to the standard of care, directly led to the decedent's death.

20. There was a failure, due to lack of clinical acumen, to detect hypovolemic shock in subtle findings of fainting, loss of consciousness, ashen look, thready pulse, chest pain or tightness, shortness of breath and this directly lead to the decedent's death.

21. It is my opinion that the unstable patient, in the setting of a GI bleed and evidence of hypovolemic shock, should have been accompanied by medical personnel, not be left alone with custody, and should not have been left alone in a wheelchair to clean himself while waiting for EMS to arrive. Failure to attend to an unstable patient directly lead to the decedent's death.

22. Based upon a reasonable degree of medical certainty, the above stated corresponds to a dereliction of duty that directly contributed to the decedent's death.

As discovery is ongoing, I reserve the right to supplement and/or amend my opinions.

I hereby certify that this report is a complete and accurate statement of all of my opinions, and the basis and reasons for them, to which I will testify under oath.

**REVIEWER SIGNATURE**

**Edna Wong Mckinstry, MD, FACP**
**Internal Medicine, Board Certified**
**North Carolina Licensure: 2016-01960**
**Texas Licensure: Q2870**
**Arizona Licensure: 44626**