```
                                                           Page 1
 1
      IN THE UNITED STATES DISTRICT COURT
 2    FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT BECKLEY
 3    MIRANDA DAWN SMITH, on behalf
      of the ESTATE OF ALVIS RAY
 4    SHREWSBURY,                              CASE NO.
                                               5:23-cv-00210
 5              Plaintiff,
 6         vs.
 7    WEST VIRGINIA DIVISION OF
      CORRECTIONS AND
 8    REHABILITATION, et al.,
 9              Defendants.
10
11
12         DEPOSITION OF EDNA WONG MCKINSTRY, M.D.
13                 (Taken by Defendants)
14               Durham, North Carolina
15                  March 16, 2024
16
17
18    Reported by Andrea L. Kingsley, RPR
19
20
21
22
23
24
25
```

EXHIBIT C

Page 54

1  was recorded?" And she said yes. So he already
2  came into this game behind the eight ball, he's
3  already hypoxic, and then they shipped him
4  somewhere with someone who doesn't know hypoxia,
5  what it can do, that is just scary. It's something
6  that wouldn't happen in the hospital for example.
7      So don't take the hospital for example.
8  If you saw someone on the street and he had fallen
9  down, maybe passed out, and there was blood all
10 over the place, you don't necessarily get the
11 person up. You would call 911 like, hey, there's
12 someone on the floor. You know. Take the jail out
13 of equation, take the prison out of the equation,
14 if any person were to be found down and appeared to
15 have passed out, was kind of like not looking -- I
16 think there was someone who said that he looked
17 gray while he was talking. So if someone looks
18 gray and not pink like you and me, you wouldn't
19 just leave him and get him up, you know, you would
20 say, hey, hang on, let's call 911. You know.
21     Which didn't happen though. They got
22 him up and their pretext was we're going to call
23 911 but you need to clean up before 911 gets here
24 which never happens in the inpatient setting. No
25 matter how messy you are, you can be full of poop

Page 55

1  and whatnot, we'd still treat you. We clean you
2  afterwards. That's after the fact. But their
3  priority was to clean him up.
4      Q.   You don't believe being covered in blood
5  and feces presents a health hazard?
6      A.   It can, but the patient has to be
7  stabilized, Mr. Adam. You can't clean them up and
8  then stabilize them because that's kind of
9  backwards.
10     Q.   Do you believe there were any other
11 violations of the standard of care with regard to
12 Mr. Shrewsbury on the day and night of his death
13 that we haven't already discussed?
14     A.   Is there any other circumstances --
15     Q.   Any other violations of the standard of
16 care that we haven't addressed?
17     A.   Other than not calling 911 timely, not
18 recognizing an emergency that's about -- emergency
19 in evolution, that's the language I use because it
20 was in evolution and technically it can go both
21 ways, and we addressed the oxygen levels being
22 down. We addressed he would need to be assessed
23 more frequently than one time, like the one time
24 blood pressure reading that he got.
25     I'm thinking. I'm just going over the

Page 56

1  events in my head, that's why there's a delay in my
2  response.
3      Yeah, other than that, I don't currently
4  see any other violations in standard of care.
5      MR. NEW:  I'm going to note an
6  objection for the record, she's not the
7  standard of care expert in this case.
8      MR. STRIDER:  Okay, I will phrase
9  it this way then:
10     Q.   Rather than any violations in the
11 standard of care, any acts or omissions, any
12 wrongful acts or omissions that proximately caused
13 his death?
14     A.   Other than what was already discussed?
15     Q.   Other than what was already discussed,
16 yes. That's just my clean up question in case
17 there's something that's very important to your
18 opinion that I didn't think to ask you about.
19     A.   Okay, got it. Sorry. No. Not
20 currently that I can think of.
21     (Exhibit 4, Dr. McKinstry's
22 rebuttal report dated February 29, 2024,
23 marked for identification, as of this date.)
24     Q.   I want to move on now to the second
25 report that you produced on February 9, 2024.

Page 57

1  What new information did you receive
2  that caused you to produce the second report?
3      A.   Oh, Mr. Adee --
4      Q.   Mr. Adee's report?
5      A.   Yes, because I was asked to comment on
6  his report.
7      Q.   Was there anything else that was new
8  that you received in advance of this report and you
9  didn't have yet for your original one? Other than
10 the video, I believe you said you hadn't seen the
11 video yet when you issued your first report.
12     A.   Yes.
13     Q.   So your conclusions in this second
14 report seem to be, first, that you don't believe
15 calling EMS was untimely but, second, you believe
16 that the decision to put Mr. Shrewsbury in a sitting
17 or standing position and then leaving him alone with
18 only correctional personnel were -- Mr. New
19 corrected me earlier about violating the standard of
20 care but were wrongful acts or omissions. Is that
21 right?
22     A.   Yes.
23     Q.   And those -- the moving him into a
24 standing/sitting position and leaving him alone with
25 only correctional officers seemed to me to be

15 (Pages 54 - 57)