# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

MIRANDA DAWN SMITH
*on behalf of the Estate of*
Alvis Ray Shrewsbury,

      Plaintiff,

v.                                 CIVIL ACTION NO.  5:23-cv-00210

WEST VIRGINIA DIVISION OF
CORRECTIONS AND REHABILITATION, and
AARON JOHNSON, *individually as an employee*
*of the West Virginia Division of Corrections*
*and Rehabilitation*, and
JOHAN RADOSEVICH, *individually as an employee*
*of the West Virginia Division of Corrections*
*and Rehabilitation*, and
ASHLEY TONEY, *individually as an employee*
*of the West Virginia Division of Corrections*
*and Rehabilitation*, and
NICHOLAS BURTON, *individually as an employee*
*of the West Virginia Division of Corrections*
*and Rehabilitation*, and
WEXFORD HEALTH SOURCES, INC., and
ERICA WADE, *LPN, individually as an employee*
*of Wexford Health Sources, Inc*., and
JOHN/JANE DOE WEXFORD EMPLOYESS, and
JOHN/JANE DOE CORRECTIONAL OFFICERS,

      Defendants.

## <u>MEMORANDUM OPINION & ORDER</u>

Pending are Defendants West Virginia Division of Corrections and Rehabilitation

("the WVDCR"), Aaron Johnson, Johan Radosevich, Ashley Toney, and Nicholas Burton's

(hereinafter, together "the WVDCR Defendants") Motion for Summary Judgment [Doc. 276],

filed May 20, 2024, and Defendants Wexford Health Source, Inc. ("Wexford") and Erica Wade's (hereinafter, together "the Wexford Defendants") Motion for Summary Judgment [Doc. 284], filed May 21, 2024. Also pending is Plaintiff Miranda Dawn Smith's Motion for Partial Summary Judgment [Doc. 280], filed May 21, 2024. The matters are ready for adjudication.

**I.**

*A.    Factual Background*

On August 29, 2022, Alvis Ray Shrewsbury began serving a six-month term of imprisonment at Southern Regional Jail (hereinafter "SRJ") in Beaver, West Virginia. [Doc. 1 at 5 ¶ 28]. He was initially placed in C-pod Section 3 ("the quarantine unit") for quarantine measures due to the COVID-19 pandemic. [Doc. 289-3 at 4]. Despite the implications of its name, inmates in the quarantine unit were permitted to leave their cells and interact freely with one another. [*Id.*]. While in the quarantine unit, Mr. Shrewsbury was repeatedly beaten by a group of inmates who stole his daily food trays, bottles of drinking water, and personal commissary food. [*Id.* at 19–20]. According to fellow inmates, for several days, Mr. Shrewsbury complained of stomach pain and bruising around his back, sides, and ribs. [*Id.*; Doc. 289-1 at 3]. Mr. Shrewsbury asked Defendant Aaron Johnson, a correctional officer, if he could be moved to a new section because of the continued thefts and beatings, but Defendant Johnson refused. [Doc. 289-3 at 19–20].

On September 6, 2022, during a routine medication pass, Nurse Hanna Corkrean noted that Mr. Shrewsbury had a black eye. [Doc. 276-7 at 3]. When asked, Mr. Shrewsbury denied being involved in an altercation and told Nurse Corkrean that he had simply fallen out of bed. [*Id.*]. Nurse Corkrean reportedly made the inmate an appointment to see the jail physician. [*Id.*].

The dark bruising around his left eye was also visible to family members who participated in several video calls with Mr. Shrewsbury between September 6, 2022, and September 10, 2022. [Doc. 289-3 at 6]. During these calls, Mr. Shrewsbury "indicated that his ribs were injured or broken, he could hardly breathe, his urine had blood in it, and he was hurting badly." [*Id.*]. He also expressed his fear of not making it out of SRJ alive. [*Id.*].

On September 10, 2022, upon completing the mandatory quarantine period, Mr. Shrewsbury was relocated to general population in C-pod Section 5 ("C-5"). [Doc. 276-7 at 3; Doc. 289-3 at 6]. While in C-5, Mr. Shrewsbury's health began to deteriorate. He continued to complain of "stomach pain and hurting in his ribs and his side." [Doc. 276-6 at 3]. On September 13, 2022, a chest x-ray was performed. [Doc. 276-4 at 7]. The x-ray came back "clear," and a physician exam was deferred. [*Id.*; Doc. 276-4 at 9].

Defendant Erica Wade, LPN, testified that shortly before 12:29 p.m. on September 16, 2022, an officer escorted Mr. Shrewsbury to the medical unit. [Doc. 284-2 at 6–7]. According to Defendant Wade, Mr. Shrewsbury "appeared to be detoxing." [*Id.*]. She described him as looking "sweaty" and "pale" with "snot coming from his nose." [*Id.*]. Despite complaints of "nausea, vomiting, [and] diarrhea," because Mr. Shrewsbury's vital signs were allegedly within normal limits,[1] Defendant Wade simply "reordered" Pepto-Bismol,[2] and Mr. Shrewsbury was escorted back to his cell. [*Id.*].

---

[1] Although she testified that Mr. Shrewsbury's vital signs were within normal limits, Defendant Wade failed to document the encounter, and thus, she could not recall the exact measurements she obtained. [Doc. 284-2 at 6–7]. However, she contended that if Mr. Shrewsbury's vital signs had been "abnormal," she "would've contacted a provider immediately or . . . housed [Mr. Shrewsbury] in medical for observation." [*Id.*].

[2] It appears Mr. Shrewsbury was also given Pepto-Bismol on September 12th, 13th, and 14th, although it is not clear from the record why it was ordered on these dates. [*See* Doc. 284-2 at 6].

At approximately 12:00 a.m. on September 17, 2022, Mr. Shrewsbury once again "complained of not feeling well and need[ing] to have a bowel movement." [Doc. 289-1 at 3]. According to his cellmate, Brandon Lambert, "Mr. Shrewsbury sat down on the commode, but then suddenly stood up, collapsed on the floor, and began bleeding profusely from his rectum." [Doc. 1 at 13 ¶ 91]. Surveillance footage from that night shows Mr. Shrewsbury lying prostrate with his "legs . . . at the entrance of [his] cell" at 12:04 a.m. [Doc. 289-1 at 3; Doc. 289-3 at 7].

At approximately 12:05 a.m., staff responded to a call "asking for medical assistance to the cell for an inmate who had passed out." [Doc. 289-1 at 3]. According to several staff Incident Reports completed that night, Defendant Johan Radosevich, Correctional Officer Aiden Jarrell, and Nurse Staci Perry proceeded immediately to Mr. Shrewsbury's cell while Sergeant Jared Williams went to medical to retrieve Nurse Tiffany Mullins and a crash cart. [Doc. 289-3 at 16–19].

When Defendant Radosevich, Officer Jarrell, and Nurse Perry arrived at his cell, Mr. Shrewsbury was "being held up on the toilet" by another inmate. [Doc. 289-3 at 16]. Although he was still responsive, Mr. Shrewsbury looked "gray" and was "sweating profusely" while other inmates poured water over his face. [*Id.*]. Defendant Radosevich instructed Officer Jarrell to initiate lockdown protocol and clear the cell. [*Id.*].

Shortly thereafter, Sergeant Williams and Nurse Mullins reached Mr. Shrewsbury's cell. [*Id.*] Although Nurse Mullins reports that Mr. Shrewsbury was lying in his bunk when she and Sergeant Williams arrived, [*Id.* at 18], Sergeant Williams reports that Mr. Shrewsbury was lying "on a mat on the floor stating that he fell out [of his bunk]," [*Id.* at 17]. Mr. Shrewsbury complained of chest pain and told staff "he felt as if he needed to have a bowel movement." [*Id.*]. At approximately 12:08 a.m., Nurse Mullins and Nurse Perry took Mr. Shrewsbury's vitals. [*Id.*].

4

While there is some discrepancy between reports, Nurse Mullins's report indicates that Mr. Shrewsbury's blood pressure was 140/76 mmHg, his oxygen level was 76%, and his heart rate was 45 bpm. [*Id.* at 18; *but see id.* at 17 (Sergeant Williams reporting Mr. Shrewsbury's blood pressure was 140/75 mmHg, his oxygen level was 86%, and his heart rate was 45 bpm)]. Because Mr. Shrewsbury's oxygen levels were low, Nurse Mullins recommended sending Mr. Shrewsbury to the hospital. [*Id.* at 18]. Sergeant Williams instructed Officer Jarrell to retrieve a wheelchair so Mr. Shrewsbury could first be taken to medical "where an EKG could be conducted." [*Id.* at 17].

At approximately 12:14 a.m., Officer Jarrell returned with a wheelchair and Sergeant Williams "stepped out of the section to talk with [Sergeant Blake] about the incident." [Doc. 289-3 at 9, 17; Doc. 289-4 at 2; Doc. 289-7 at 9]. Both Officer Jarrell and Defendant Radosevich report assisting Mr. Shrewsbury into the wheelchair. [Doc. 284-3 at 18–20; Doc. 289-3 at 16–17]. However, several inmates who witnessed the incident reported hearing staff laughing at and making fun of Mr. Shrewsbury while telling him to get in the wheelchair by himself. [Doc. 289-3 at 20–21, 26; Doc. 290-3 at 15].

While transferring to the wheelchair, "a copious amount of blood and fecal matter came out of [Mr. Shrewsbury's] pants" and down his legs. [Doc. 284-3 at 13, 20, 29]. Nurse Mullins told Sergeant Williams that she believed Mr. Shrewsbury "has a possible GI bleed and needed to be sent to the hospital urgently." [Doc. 289-3 at 17]. Sergeant Williams reports telling the nurses to call for an ambulance before going to medical to help Nurse Mullins locate the appropriate paperwork. [*Id.*] At approximately 12:15 a.m., surveillance footage shows Sergeant Williams and Nurse Mullins leaving the scene. [*Id.* at 9, 26]. She reports that at approximately 12:17 a.m., she ran to call the on-call doctor, "Dr. Rashid," but he did not answer the phone. [*Id.* at 18]. She then called Nurse Beth Waugh, who suggested Nurse Mullins call "the next doctor[,] .

5

. . Dr. Baldera." [*Id.*]. Nurse Mullins called Dr. Baldera at 12:23 a.m., but there was no answer. [*Id.*]. At 12:24 a.m., Nurse Mullins managed to get ahold of "Dr. Martin" who told her to send Mr. Shrewsbury to the hospital. [*Id.*]. However, Nurse Perry had already contacted Emergency Medical Services ("EMS") at approximately 12:21 a.m. [*Id.* at 19].

At approximately 12:17 a.m., Defendant Radosevich and Officer Jarrell began transporting Mr. Shrewsbury to the booking department to await the arrival of an ambulance. [Doc. 289-3 at 10; Doc. 291-1 at 2]. Upon entering the booking department, Sergeant Blake suggested Defendant Radosevich take Mr. Shrewsbury to the shower and help him clean up. [Doc. 276-4 at 11; Doc. 289-3 at 17]. Mr. Shrewsbury, however, was too weak to stand in the shower, and Defendant Radosevich was "unable to hold him up" by himself. [Doc. 289-3 at 17]. At 12:24 a.m., Defendant Radosevich exited the bathroom to radio for help. [*Id.* at 11, 17]. Approximately three minutes later, Defendant Radosevich and Officer Jarrell re-entered the bathroom and discovered an unresponsive Mr. Shrewsbury. [*Id.* at 26; Doc. 280-3 at 17; Doc. 280-26 at 27; Doc. 284-3 at 23]. Defendant Radosevich then "called for Medical to respond to Booking." [Doc. 289-3 at 17].

At approximately 12:28 a.m., Nurse Perry, Nurse Mullins, Sergeant Williams, and Sergeant Blake entered the bathroom and saw Mr. Shrewsbury laying on the bathroom floor. [Doc. 289-3 at 13, 18, 26]. Sergeant Blake attempted to wake Mr. Shrewsbury by placing "ammonia capsules" under his nose, but he did not respond. [*Id.* at 18]. Nurse Perry and Nurse Mullins then took Mr. Shrewsbury's vital signs. [*Id.*]. Both Mr. Shrewsbury's pulse and oxygen level were "lower than the last time." [*Id.* at 17]. At approximately 12:40 a.m., "medical staff were unable to get a pulse." [*Id.*]. Sergeant Blake "instructed medical personnel that [Mr.] Shrewsbury needed oxygen but the first tank brought to booking did not have the correct equipment." [*Id.*]. Sergeant

Blake then initiated CPR while Nurse Mullins "utilized an Ambu bag.[3]" [*Id.*]. Sergeant Williams "called 911 dispatch [to] inform[] them of the changes" to Mr. Shrewsbury's condition. [*Id.*].

EMS arrived at approximately 12:41 a.m. and immediately began "life saving measures." [Doc. 280-3 at 5; Doc. 289-3 at 16].  At approximately 12:57 a.m., Mr. Shrewsbury was placed on a stretcher and loaded into the back of the ambulance. [Doc. 280-3 at 17]. The ambulance departed from SRJ at approximately 1:10 a.m., [Doc. 284-6 at 1], and arrived at the emergency room at Beckley Appalachian Regional Hospital ("BARH") at approximately 1:19 a.m., [*Id.*].

Medical staff at BARH were unable to resuscitate Mr. Shrewsbury, and he was pronounced dead at 2:07 a.m. [Doc. 280-3 at 1; Doc. 284-7 at 20–22]. On October 1, 2022, an autopsy was performed by Drs. John C. Hiserodt, M.D., and Rockefeller F. Cooper, II, M.D., of Third Eye Forensic Consultancy, LLC. [Doc. 280-26 at 3]. In their Final Autopsy Report, they opined as follows:

> Mr. Shrewsbury died as a result of complications of hypertensive and atherosclerotic disease. In this regard, the heart was enlarged (cardiomegaly), the left ventricular free wall was thickened (concentric hypertrophy) and there was significant, calcified atherosclerotic occlusion of the left coronary artery. The right coronary ostium was anomalous and congenitally narrow. Anomalous coronary artery syndrome is a well-known risk for sudden unexpected death in the forensic literature. No fatal blunt force injuries were identified at autopsy and no evidence of fatal internal bleeding was present. The immediate cause of death was an acute myocardial infarct (heart attack) due to the above conditions.

[Doc. 220-2 at 2–3]. Drs. Hiserodt and Cooper also noted evidence of "blunt force trauma to the head and right arm." [Doc. 289-3 at 22].

---

[3] An "Ambu bag" is the proprietary name for a bag valve mask or manual resuscitator, a hand-held device used to provide positive pressure ventilation to patients who are not breathing adequately.

In addition to the autopsy conducted by Dr. Cooper, the Office of the Chief Medical Examiner of the State of West Virginia ordered an autopsy be performed. [*Id.* at 2]. On October 27, 2022, Dr. Paul F. Mellen, M.D., a forensic pathologist, completed an autopsy and produced a Report of Death Investigation and Post-Mortem Examination Findings. [Doc. 289-7 at 8]. In his report, Dr. Mellen concluded that Mr. Shrewsbury's died as a result of "acute and chronic upper gastrointestinal bleeding," with a contributory factor of "cardiomegaly." [*Id.*].

Dr. Mellen's autopsy report also notes that while Mr. Shrewsbury's body showed no signs of trauma, there was evidence of healing "racoon ecchymosis"[4] around Mr. Shrewsbury's left eye. [Doc. 289-1 at 3]. A toxicology report came back negative for alcohol or drugs. [*Id.* at 4].

## B.    *Procedural History*

On March 15, 2023, Ms. Smith instituted this action on behalf of Mr. Shrewsbury's estate against the WVDCR Defendants, the Wexford Defendants, Ashley Stroup,[5] and Beth Waugh,[6] as well as various "John/Jane Does." [Doc. 1].   The Complaint asserts the following claims: Count I – Eighth Amendment Violations; Count II – Conspiracy to Commit "Fourteenth" Amendment Violations; Count III – Failure to Intervene/Bystander Liability; Count IV – Negligence; Count V – Medical Negligence; Count VI – Gross Negligence; Count VII – Intentional Infliction of Emotional Distress ("ÍIED"); Count VIII – Common Law Civil Conspiracy; Count IX – Negligent Hiring; Count X – Negligent Supervision and Training; and

---

[4] "Racoon ecchymosis" or "raccoon eyes," are large, dark bruises on and around the eyelids.

[5] On December 4, 2023, the parties stipulated to the dismissal of Defendant Ashley Stroup without prejudice pursuant to *Federal Rule of Civil Procedure* 41(a)(1)(A)(ii). [Doc. 143].

[6] On March 25, 2024, the parties stipulated to the dismissal of Defendant Beth Waugh without prejudice pursuant to *Federal Rule of Civil Procedure* 41(a)(1)(A)(ii). [Doc. 249].

Count XI – Negligent Retention. [*Id.*]. Ms. Smith seeks to recover "all damages permitted under the law, including but not limited to, all damages recoverable under the West Virginia wrongful death statute, [*West Virginia Code* section 55-7-5]."[7] [*Id.*]

On May 20, 2024, the WVDCR Defendants moved for summary judgment, seeking judgment as a matter of law on all claims asserted against the WVDCR and its employees. [Doc. 276]. Likewise, on May 21, 2024, the Wexford Defendants moved for summary judgment, seeking judgment as a matter of law on all claims asserted against Wexford and Defendant Wade. [Doc. 284]. Ms. Smith responded to both Motions on June 4, 2024 [Docs. 289, 290]. Defendants filed their respective replies on June 11, 2024 [Docs. 293, 296].

On May 21, 2024, Ms. Smith filed her own motion for partial summary judgment [Doc. 280], to which Defendants responded on June 4, 2024 [Docs. 291, 292].

**II.**

*Federal Rule of Civil Procedure* 56 provides that summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246 (1986). "The nonmoving party must do so by offering 'sufficient proof in

---

[7] *West Virginia Code* section 55-7-5 provides,

Whenever the death of a person shall be caused by wrongful act, neglect, or default, and the act, neglect or default is such as would (if death had not ensued) have entitled the party injured to maintain an action to recover damages in respect thereof, then, and in every such case, the person who, or the corporation which, would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to murder in the first or second degree, or manslaughter.

the form of admissible evidence' rather than relying solely on the allegations of her pleadings." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)).The Court must "view the evidence in the light most favorable to the [nonmoving] party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (internal quotation marks and citation omitted); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018).

When faced with cross-motions for summary judgment, the Court applies the above standard and must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). "The court . . . cannot weigh the evidence or make credibility determinations." *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *see Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). In general, if "an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment.

### III.

### A.    *Defendants' Motions for Summary Judgment*

Together, Defendants' Motions seek summary judgment on all claims asserted herein. Accordingly, the Court will address each Count in turn.

### 1.    Count I

Count I asserts an Eighth Amendment claim for deliberate indifference pursuant to 42 U.S.C. § 1983 against the WVDCR Defendants and Defendant Wade [Doc. 1 at 15]. The

WVDCR Defendants contend they are entitled to summary judgment on Count I inasmuch as there is no evidence demonstrating (1) the WVDCR Defendants had actual knowledge of an excessive risk to Mr. Shrewsbury's safety, or (2) any action or inaction of the WVDCR Defendants caused or contributed to the death of Mr. Shrewsbury. [Doc. 277 at 6–8]. Defendant Wade contends she is entitled to qualified immunity. [Doc. 281 at 16].

42 U.S.C. § 1983 governs actions against state officers for certain civil rights violations as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983. A state actor sued in his individual capacity for monetary damages generally qualifies as a suable "person" under Section 1983. *Hafer v. Melo*, 502 U.S. 21, 27 (1991). But he may be entitled to qualified immunity. Qualified immunity is available only to those who do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Garrett v. Clarke*, 74 F.4th 579, 583 (4th Cir. 2023). A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up); *see D.C. v. Wesby*, 583 U.S. 48, 63 (2018); *Garrett*, 74 F.4th at 584. "To determine if the right in question was clearly established, we first look to cases from the Supreme Court, th[e] Court of Appeals, or the highest court of the state in which the action arose." *Thompson v. Virginia.*, 878 F.3d 89, 99 (4th Cir. 2017) (citing *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004)); *Franklin v. City of Charlotte*, 64 F.4th 519 (4th Cir. 2023). Absent "directly on-point, binding

authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." *Booker v. South Carolina Dep't of Corrections*, 855 F.3d 533, 543 (4th Cir. 2017); *Owens*, 372 F.3d at 279. In sum, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

Thus, resolving questions of qualified immunity at summary judgment requires a two-pronged inquiry: (1) whether the alleged facts, when viewed in the light most favorable to the party asserting the injury, demonstrate that the official's conduct violated a federal right, and (2) whether such right was "clearly established" at the time of the alleged violation. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014); *see also Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021). The second prong presents a "purely legal question . . . [that] is always capable of decision at the summary judgment stage." *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005) (internal quotation marks omitted). While courts can choose the order in which to engage these two prongs, "[i]f the answer to either question is no, then the official is entitled to qualified immunity." *Halcomb*, 992 F.3d at 319.

### a.    Deliberate Indifference to Serious Medical Need

"The Eighth Amendment, which is applicable to the States through the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishments.'" *Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017) (quoting U.S. Const. amend. VIII). This proscription accords inmates the right "to receive adequate medical care while incarcerated." *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) (citing *Scinto v. Stansberry*, 841 F.3d 219, 236 (4th Cir. 2016)). "This right . . . requires that government officials not be deliberately indifferent to any serious medical needs of the detainee." *Tarashuk v. Givens*, 53 F.4th 154, 163 (4th Cir. 2022) (internal

quotation marks omitted).

"A successful medical deliberate indifference claim has two components, objective and subjective." *Phoenix v. Amonette*, 95 F.4th 852, 859 (4th Cir. 2024) (internal quotation marks omitted). "The objective component requires that the plaintiff's medical condition be serious -- one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (cleaned up). "The subjective component requires showing that the defendant had actual subjective knowledge of both the [plaintiff's] serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (cleaned up). "A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (internal quotation marks omitted).

Deliberate indifference can be manifested by prison officials in various ways, including intentionally denying or delaying medical care, or intentionally interfering with prescribed medical care. *See, e.g.*, *Scinto*, 841 F.3d at 236 (holding that it was clearly established in 2005 that denying a prisoner his prescribed insulin can violate the Eighth Amendment); *Jehovah v. Clarke*, 798 F.3d 169, 181–82 (4th Cir. 2015) (emphasizing that refusal to treat serious medical needs can constitute deliberate indifference); *Smith v. Smith*, 589 F.3d 736, 739 (4th Cir. 2009) (explaining that delay in treatment can violate Eighth Amendment). "[M]ere disagreements between an inmate and [prison staff] over the inmate's proper medical care," however, are insufficient to establish deliberate indifference "absent exceptional circumstances." *Scinto*, 841 F.3d at 225. Deliberate indifference is a "higher standard for culpability than mere negligence or

13

even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "[T]reatment must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Stevens v. Holler*, 68 F.4th 921, 933 (4th Cir. 2023) (internal quotation marks omitted).

"A prisoner's right to adequate medical care and freedom from deliberate indifference to medical needs has been clearly established by the Supreme Court and this Circuit since at least 1976 and, thus, was clearly established at the time of the events in question." *Scinto*, 841 F.3d at 236. Thus, the Court turns to whether the alleged facts, when viewed in the light most favorable to Ms. Smith, demonstrate that Defendants' conduct violated Mr. Shrewsbury's right to be free from deliberate indifference to his serious medical need.

As an initial matter, the Court finds Ms. Smith has put forth sufficient evidence to demonstrate Mr. Shrewsbury suffered from an objectively serious medical condition such that "even a lay person would easily recognize the necessity for a doctor's attention." *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019). Ms. Smith offered expert testimony of Dr. Edna Wong Mckinstry, M.D., F.A.C.P., who concludes "[p]ictures of [Mr. Shrewsbury's] cell, as well as pictures from the Booking cell, had evidence of copious blood in and around the toilet bowl, on the cell floor, on the mattress where [Mr. Shrewsbury] fainted, [and] on the floor of the Booking cell." [Doc. 289-1 at 3]. Witness reports also indicated that Mr. Shrewsbury appeared "gray" and "complained of chest pain [and] trouble breathing." *Id.* It does not take medical training to recognize that someone who appears "gray" and is profusely bleeding from the rectal area may need medical attention. This is precisely the kind of medical distress that even a lay person could easily recognize. The evidence supports an inference that Mr. Shrewsbury's medical need was

objectively serious. Therefore, Ms. Smith has satisfied the first prong of the deliberate indifference inquiry.

Turning to the subjective prong of the deliberate indifference inquiry, Ms. Smith has not adduced *any* evidence, and the Court cannot discern any, that Defendants Johnson, Toney, or Burton had actual, subjective knowledge of Mr. Shrewsbury's serious medical condition or that they were present when the events in questions took place. In fact, the record establishes that Defendant Burton was notified of the incident by phone *after* EMS arrived on scene and that "he was on his way in" when he received the call. [Doc. 280-3 at 19–20].

There is evidence, however, Defendant Radosevich assisted Mr. Shrewsbury on the night in question and recognized the seriousness of Mr. Shrewsbury's condition. [*See, e.g.*, Doc. 289-4 at 1 (Radosevich testifying that he knew Mr. Shrewsbury "need[ed] to go to the hospital . . . urgently," and that "something bad [was] really, really happening to this guy.")]. But deliberate indifference requires more. The officer must have also had actual knowledge of the excessive risk to the inmate's health posed by his actions or inactions. *Pfaller v. Amonette*, 55 F.4th 436, 445 (4th Cir. 2022) ("[A] plaintiff must show the prison official . . . recognized that his actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." (internal quotation marks omitted)); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) ("[I]t is not enough that the defendant should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction."). In viewing the record in the light most favorable to Ms. Smith, the Court finds that genuine issues of material fact exist as to whether Defendant Radosevich knew that his actions or inactions were insufficient to mitigate the risk of harm to Mr. Shrewsbury.

15

The WVDCR Defendants further contend summary disposition is warranted because Ms. Smith failed to show the alleged acts caused Mr. Shrewsbury's death, as is required to recover under the West Virginia wrongful death statute. This argument is foreclosed by the Complaint itself, which repeatedly asserts "Plaintiff will seek to recover all damages permitted under the law, *including but not limited to*, all damages recoverable under the West Virginia wrongful death statute . . . ." [Doc. 1 at 16–28 (emphasis added)]. Moreover, our Court of Appeals has made clear that "[a]n actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury. Instead, it is enough that the defendant's actions exposed the plaintiff to a substantial *risk* of serious harm." *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017) (cleaned up); *see also Price v. City of Charlotte*, 93 F.3d 1241, 1246 (4th Cir. 1996) ("[T]o recover more than *nominal damages* [in a § 1983 action], actual injury caused by the constitutional violation must be proved by sufficient evidence."). The record is sufficient for Ms. Smith to introduce to a jury her claim that the actions or inactions of the WVDCR Defendants "exposed" Mr. Shrewsbury "to a substantial risk of serious harm." *Heyer*, 849 F.3d at 211. No expert is needed where the jury is capable of an unaided understanding of the risks of delaying emergency care to someone in Mr. Shrewsbury's state. Accordingly, to the extent Count I alleges a claim of deliberate indifference to serious medical needs, Defendant Radosevich is not entitled to summary judgment.

The Court further finds that genuine issues of material fact exist with respect to whether Defendant Wade was deliberately indifferent to Mr. Shrewsbury's medical needs. At the time of his encounter with Defendant Wade, Mr. Shrewsbury complained of nausea, vomiting, and diarrhea, appeared sweaty and pale, and had mucus coming out of his nose. While Defendant Wade renewed Mr. Shrewsbury's prescription for Pepto-Bismol, a recognized treatment for temporary

digestive discomfort, evidence suggests Mr. Shrewsbury had been experiencing persistent abdominal pain. *See De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (holding that, even if defendants "provided [plaintiff] with *some* treatment . . . , it does not follow that [defendants] have necessarily provided *constitutionally adequate* treatment"); *see also Cesal v. Moats*, 851 F.3d 714, 723 (7th Cir. 2017) ("Continuing an ineffective treatment plan . . . may evidence deliberate indifference."). The parties' retained experts provide contradictory analyses of Defendant Wade's actions and whether she provided adequate treatment. [Doc. 290-1 at 48; Doc. 290-2 at 5; Doc. 290-3 at 1–2; Doc. 292-3 at 8, 14, 28]. Inasmuch as there is disputed evidence as to whether Defendant Wade acted with deliberate indifference, qualified immunity, as a purely factual matter, is inappropriate. Accordingly, the Wexford Defendants' motion for summary judgment is denied on Count I.

**b.    Duty to Protect**

The Eighth Amendment's prohibition on "cruel and unusual punishments" also imposes certain duties on prison officials, including taking "reasonable measures to guarantee the safety of the inmates." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (cleaned up). "Specifically, corrections officers have a duty to protect prisoners from violence at the hands of other prisoners, for being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Id.* (cleaned up); *see also Farmer*, 511 U.S. at 833 ("[G]ratuitously allowing the beating . . . of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency." (cleaned up)); *Thompson*, 878 F.3d at 100 ("[C]ontrolling authority clearly establishes an inmate's right to reasonable protection from malicious assault.").

That said, "not every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir.2015) (internal quotation marks omitted). For liability to attach, an inmate must satisfy a two-part test:

> First, the inmate "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury," or a substantial risk thereof. *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014) (internal quotation marks omitted); *see Farmer*, 511 U.S. at 834 . . . . This objective inquiry "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 . . . (1993).
>
> Second, an inmate must show that the prison official had a "sufficiently culpable state of mind," which, in this context, consists of "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834 . . . (internal quotation marks omitted). This subjective inquiry requires "evidence suggesting that the prison official had actual knowledge of an excessive risk to the plaintiff's safety." *Danser*, 772 F.3d at 347. The defendant must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837 . . . (emphasis added). An inmate can, however, prove an official's actual knowledge of a substantial risk "in the usual ways, including inference from circumstantial evidence." *Id.* at 842 . . . . In other words, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

*Raynor*, 817 F.3d at 127–28.

Actual knowledge alone does not ineluctably result in liability. Rather, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk." *Id.* at 128 (quoting *Farmer*, 511 U.S. at 844). For example, courts have found that "prison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm." *Id.* (quoting *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995)); *see also Winfield v. Bass*, 106 F.3d 525, 532 (4th Cir.1997) (en banc) ("[S]uch heroic measures are not constitutionally required."). "But 'completely failing to take any action' to stop an ongoing assault

on a prisoner can amount to deliberate indifference." *Raynor*, 817 F.3d at 128 (quoting *Winfield*, 106 F.3d at 532); *see also, e.g.*, *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 773 (4th Cir.2003) ("[Correctional officers'] failure to act in response to [an inmate's] requests to be removed from the cage adjacent to his attackers constituted deliberate indifference to [the inmate's] Eighth Amendment rights . . . .").

Absent from the evidentiary record is any indication that Defendants Burton, Toney, or Radosevich knew Mr. Shrewsbury had been beaten by other inmates or was in jeopardy of being harmed by other inmates.  Assessing, however, the facts and reasonable inferences in Ms. Smith's favor, the Court finds that genuine issues of material fact exist with respect to whether Defendant Johnson was deliberately indifferent to Mr. Shrewsbury's right to reasonable protection from violence at the hands of other inmates. Defendant Johnson's deposition testimony is inconsistent with inmate reports that he incited other inmates to "jump" Mr. Shrewsbury and ignored Mr. Shrewsbury's repeated requests to move sections. [Doc. 289-3 at 19–21; Doc. 289-8 at 1–3]. Accordingly, to the extent Count I alleges a claim for failure to protect, summary judgment is not warranted as to Defendant Johnson.

## 2.    Count II

In Count II, Ms. Smith asserts a claim against the WVDCR Defendants and Defendant Wade for conspiring to violate "the constitutional rights guaranteed to Mr. Shrewsbury under the Eighth Amendment to the United States Constitution." [Doc. 1 at 17].[8]

---

[8] Because Mr. Shrewsbury was a "post-conviction inmate," the WVDCR Defendants contend that summary judgment is warranted as to Count II because "any claims . . . brought on behalf of Mr. Shrewsbury must be analyzed through the specific provisions and analysis of the Eighth Amendment and not the general due process provisions of the Fourteenth Amendment." [Doc. 277 at 9]. Although the title of Count II is "Conspiracy to Committ [sic] Fourteenth Amendment Violations," the numbered allegations under Count II repeatedly and unambiguously allege a conspiracy to violate Mr. Shrewsbury's "Eighth Amendment" rights. [Doc. 1 at 17–18].

To establish a civil conspiracy under § 1983, a plaintiff "must present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right [of the plaintiff]." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). "While [a plaintiff need] not produce direct evidence of a meeting of the minds, [she] must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." *Id.* "In other words, to survive a properly supported summary judgment motion, [the] evidence must, at least, reasonably lead to the inference that [defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Id.*

Ms. Smith's evidence fails in this regard. She did not produce any evidence, either direct or circumstantial, that any of the named Defendants acted in concert to violate Mr. Shrewsbury's Eighth Amendment rights. The evidence did not disclose any communication between Defendants or others that might give rise to an inference of an agreement to commit any acts, wrongful, or otherwise. Nor does the evidence give rise to an inference that the alleged conspirators shared the same conspiratorial objective. Inasmuch as the evidentiary record is insufficient to raise a reasonable inference of a conspiracy, summary judgment is appropriate. Accordingly, Count II is **DISMISSED**.

### 3.    Count III

Count III, against the WVDCR Defendants and Defendant Wade, asserts a claim of "Bystander Liability" pursuant to 42 U.S.C. § 1983. [Doc. 1 at 18]. The WVDCR Defendants contend they are entitled to summary judgment on Count III because "the record is bare of any WVDCR Defendant knowing that anyone was violating Mr. Shrewsbury's constitutional rights,

having an opportunity to intervene, and choosing not to act." [Doc. 277 at 9–10].

Generally, "a law officer may incur § 1983 liability only through affirmative misconduct." *Randall v. Prince George's Cnty.*, 302 F.3d 188, 202 (4th Cir. 2002). However, our Court of Appeals has recognized liability when a plaintiff demonstrates that a "bystanding" officer "(1) knows that a fellow officer is violating an individual's constitutional rights, (2) has a reasonable opportunity to prevent the harm, and (3) chooses not to act." *Id.* at 204 (footnote omitted).

The Court agrees that the record is devoid of any evidence showing Defendants Burton, Toney, or Johnson, knew a fellow officer was violating Mr. Shrewsbury's constitutional rights and failed to exercise a reasonable opportunity to intervene. However, the Court finds that genuine issues of material fact exist as to whether Defendant Radosevich knew prison staff were being deliberately indifferent to Mr. Shrewsbury's medical needs and failed to intervene.

Accordingly, with respect to bystander liability, Defendants Burton, Toney, and Johnson are entitled to summary judgment. Count III is **DISMISSED** to that extent.

### 4.    Count IV

With respect to the negligence claim asserted in Count IV, the WVDCR Defendants contend summary judgment is appropriate because under the common law doctrine of qualified immunity, "public officials and employees are immune for acts or omissions arising out of the exercise of discretion in carrying out their duties, so long as they are not violating any known law, rule, regulation or standard or acting maliciously, fraudulently or oppressively." [Doc. 277 at 10].

To succeed on a negligence claim, a plaintiff must establish by a preponderance of the evidence that (1) "the defendant owes [the plaintiff] a duty," (2) "there was a negligent breach of that duty," and (3) "injuries received by the plaintiff resulted proximately from the breach of

the duty." *Jones v. Logan Cnty. Bd. of Educ.*, 247 W. Va. 463, 462, 881 S.E.2d 374, 383 (2022).

The Supreme Court of Appeals of West Virginia has held:

> In the absence of an insurance contract waiving the defense, the doctrine of qualified or official immunity bars a claim of mere negligence against a State agency not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29–12A–1, et seq., and against an officer of that department acting within the scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer.

Syl. Pt. 7, *Jarvis v. W. Va. State Police*, 227 W. Va. 472, 473, 711 S.E.2d 542, 543 (2010).

Accordingly, in determining whether qualified immunity bars a claim of negligence against a state official or employee, the Court must first decide whether the alleged acts or omissions of the officer are discretionary. If yes, then "a reviewing court must determine whether the plaintiff has demonstrated that such acts or omissions are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive." Syl. Pt. 11, *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 497, 766 S.E.2d 751, 756 (W. Va. 2014). A state, its agencies, and its officials are entitled to immunity from liability in the absence of such a showing. *Id.*

If, however, the plaintiff identifies a clearly established right which has been violated, then "the court must determine whether such acts or omissions were within the scope of the public official or employee's duties, authority, and/or employment." *Id.* at Syl. Pt. 12. "To the extent that such official or employee is determined to have been acting outside of the scope of his duties, authority, and/or employment, the State and/or its agencies are immune from vicarious liability, but the public employee or official is not entitled to immunity . . . ." *Id.* "If the public

official or employee was acting within the scope of his duties, authority, and/or employment, the State and/or its agencies may be held liable . . . along with the public official or employee." *Id.*[9]

As an initial matter, inasmuch as Ms. Smith has failed to adduce evidence of any conduct by Defendants Toney and Burton which might have breached any purported duty of care owed Mr. Shrewsbury, she cannot sustain a negligence claim against them. *Anderson*, 477 U.S. at 256 ("[To] defeat a . . . properly supported motion for summary judgment," the opposing party must produce "concrete evidence from which a reasonable juror could return a verdict in his favor.").

With respect to Defendants Radosevich and Johnson, the Court finds that the alleged acts and omissions of these Defendants were discretionary. *See W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 509, 766 S.E.2s 751, 768 (2014) (holding that "general functions [of] a correctional officer . . . are broadly characterized as discretionary, requiring the use of [the officer's] discretionary judgments and decisions"). However, as discussed, there remains genuine issues of material fact respecting whether these Defendants violated clearly established constitutional rights. A jury could also reasonably find that the conduct in question was within the scope of employment.

Accordingly, the WVDCR Defendants' motion for summary judgment on Count IV is denied with respect to Defendants Johnson and Radosevich.

### 5.    Count V

Defendant Wexford and Defendant Wade contend they are entitled to judgment as a matter of law on the medical negligence claim asserted in Count V because "the record does not

---

[9] The Court notes that Count IV is brought against the WVDCR Defendants in their individual capacities only. [Doc. 1 at 19]. Accordingly, the is no claim for vicarious liability against the WVDCR.

support a claim that any purported violation of any articulated standard of care proximately caused Mr. Shrewsbury's death." [Doc. 286 at 5].

In West Virginia, the Medical Professional Liability Act ("MLPA"), W. Va. Code §§ 55-7B-1 to -12, governs all "medical professional liability" actions "resulting from the death or injury of a person *for any tort* or breach of contract based on health care services rendered, or which should have been rendered, by a health care provider or health care facility to a patient." *Id.* § 55-7B-2(i) (emphasis added). This includes "other claims that may be contemporaneous to or related to the alleged tort or breach of contract or otherwise provided, all in the context of rendering health care services." *Id.*; *see also State ex rel. W. Va. Univ. Hosps., Inc. v. Scott*, 246 W. Va. 184, 193, 866 S.E.2d 350, 359 (2021).

"The failure to plead a claim as governed by the [MLPA] does not preclude application of the Act." Syl. Pt. 4, *Blankenship v. Ethicon, Inc.*, 221 W. Va. 700, 702, 656 S.E.2d 451, 453 (2007). "Where the alleged tortious acts or omissions are committed by a health care provider within the context of the rendering of 'health care' as defined by [the MLPA[10]], the Act

---

[10] The MLPA defines "health care" as follows:

(1) Any act, service or treatment provided under, pursuant to or in the furtherance of a physician's plan of care, a health care facility's plan of care, medical diagnosis or treatment;

(2) Any act, service or treatment performed or furnished, or which should have been performed or furnished, by any health care provider or person supervised by or acting under the direction of a health care provider or licensed professional for, to or on behalf of a patient during the patient's medical care, treatment or confinement, including, but not limited to, staffing, medical transport, custodial care or basic care, infection control, positioning, hydration, nutrition and similar patient services; and

(3) The process employed by health care providers and health care facilities for the appointment, employment, contracting, credentialing, privileging and supervision of health care providers.

applies regardless of how the claims have been pled." *Id*. However, if "the action in question was outside the realm of the provision of ['health care,'] the statute does not apply." *Id*. at 707, 656 S.E.2d at 458 (alteration in original) (quoting *Gray v. Mena*, 218 W. Va. 564, 570, 625 S.E.2d 326, 332 (2005)).

Ms. Smith alleges Wexford employees failed to properly evaluate, diagnose, treat, and medically manage Mr. Shrewsbury's condition, ignored Mr. Shrewsbury's repeated requests for medical attention, and failed to recognize a life-threatening medical emergency and act appropriately and expeditiously. [Doc. 1 at 20]  These allegations unquestionably relate to the provision of "health care." Because Count V is grounded in medical negligence, it is covered by the MLPA. Accordingly, the medical negligence claim in Count V requires these footings:

> [T]he health care provider failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and (2) such failure was a proximate cause of the injury or death.

W. Va. Code § 55-7B-3.

Under West Virginia law, "[i]t is the general rule that in medical malpractice cases, negligence or want of professional skill can be proved only by expert witnesses." Syl. Pt. 2, *Roberts v. Gale*, 149 W. Va. 166, 167, 139 S.E.2d 272, 273 (1964); *see also* W. Va. Code § 55-7B-7 ("The applicable standard of care and a defendant's failure to meet the standard of care, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court."). Expert testimony, however, is not required "where the lack of care or want of skill is so gross as to be apparent, or the alleged breach relates to noncomplex matters of diagnosis and treatment within the understanding of lay

---

W. Va. Code § 55-7B-2(e).

jurors by resort to common knowledge and experience. *Farley v. Shook*, 218 W. Va. 680, 629 S.E.2d 739, 746 (2006).

Defendant Wexford and Defendant Wade challenge the admissibility of certain opinions of Dr. McKinstry as unreliable pursuant to *Federal Rule of Evidence* 702. [Doc. 285 at 7–9]. The Court need not decide at this juncture whether the challenged opinions are admissible. Assuming *in arguendo* the challenged testimony is inadmissible, Plaintiff offers expert Rebekah Price, DNP, MSN, APRN, FNPC, who opined that the acts of assessment and treatment "violated the standard of care . . . in a manner that contributed to his continuing of suffering and contributed to his death." [Doc. 290-3 at 11–12]. The disagreement between the parties' experts produces a genuine dispute of material fact. Accordingly, summary judgment as to Count V is **DENIED**.

### 6.    Count VI

Count VI asserts a claim for gross negligence against the WVDCR Defendants, Defendant Wexford, and Defendant Wade. [Doc. 1 at 21]. As previously noted, there remains genuine issues of material fact that preclude the Court from finding Defendants Radosevich and Johnson are entitled to qualified immunity on the negligence claims. As to Defendants Wexford and Wade, inasmuch as the allegations contained in Count VI are within the purview of the MLPA, the Court concludes Count VI is duplicative of Count V.

### 7.    Count VII

Count VII asserts a claim against the WVDCR Defendants, Defendant Wexford, and Defendant Wade for the West Virginia tort of outrage, otherwise known as the intentional infliction of emotional distress ("IIED"). [Doc. 1 at 22]. Defendants contend summary judgment is appropriate on Count VII inasmuch as Defendants' actions were neither extreme nor outrageous

and the record is devoid of evidence that any named Defendant or Wexford personnel acted with the intent to inflict emotional distress or acted recklessly when it was certain such distress would result. [Doc. 277 at 11– 12; Doc. 285 at 9–11]. To prevail on an IIED claim, a plaintiff must show:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. Pt. 11, *Zsigray v. Langman*, 243 W. Va. 163, 166, 842 S.E.2d 716, 719 (2020) (quoting Syl. Pt. 3, *Travis v. Alcon Lab'ys, Inc.*, 202 W. Va. 369, 369, 504 S.E.2d 419, 421 (1998)); *see also Hines v. Hills Dep't Stores, Inc.*, 193 W. Va. 91, 98, 454 S.E.2d 385, 392 (1994) (Cleckley, J., concurring) (*per curiam*) (first proposing this four-part formulation of the tort of outrage)."Whether the alleged conduct may be reasonably considered outrageous is a threshold question for the court. Whether the conduct is in fact outrageous is a question for the jury." *Gilco v. Logan Cnty. Comm'n*, No. 2:11–cv–00032, 2012 WL 3580056, at *5 (S.D. W. Va. Aug. 17, 2012) (Copenhaver, J.) (cleaned up) (citing Syl. Pt. 4, *Alcon Lab'ys, Inc.*, 202 W. Va. at 369, 504 S.E.2d at 421).

Inasmuch as Ms. Smith has failed to adduce evidence of any conduct by Defendants Toney and Burton causing Mr. Shrewsbury emotional distress, her IIED claim fails. *See Anderson*, 477 U.S. at 256. The Court is, however, satisfied that a reasonable person may consider the conduct of Defendants Radosevich, Johnson, and Wade, as well as other Wexford personnel, to be plainly "outrageous" for purposes of establishing that element of the claim. The Court is also satisfied that a reasonable jury could determine that emotional distress is a natural and substantially certain

result of repeated assaults and a flagrant disregard for one's well-being during a life-threatening medical emergency.

Accordingly, summary judgment on Count VII is denied with respect to Defendants Johnson, Radosevich, Wexford and Wade.

### 8.    Count VIII

Count VIII asserts a common law civil conspiracy claim against the WVDCR Defendants, Defendant Wexford, and Defendant Wade. [Doc. 1 at 23].

A common law civil conspiracy requires "a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means." Syl. Pt. 3, *Jane Doe-1 v. Corp. of Pres. of Church of Jesus Christ of Latter-day Saints*, 239 W. Va. 428, 432, 801 S.E.2d 443, 448 (2017) (quoting Syl. Pt. 8, *Dunn v. Rockwell*, 225 W. Va. 43, 46, 689 S.E.2d 255, 258 (2009)). Civil conspiracy is not an independent basis for recovery but instead a doctrine for assigning liability to "people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)." *Id.* at Syl. Pt. 4 (quoting Syl. Pt. 9, in part, *Dunn*, 225 W. Va. at 46, 689 S.E.2d at 258). In addition to proving an underlying tort, a plaintiff proceeding on a civil conspiracy claim "must produce at least circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective and mutual agreement." *Jane Doe-1*, 239 W. Va. at 461, 801 S.E.2d at 476.

As noted, Ms. Smith has produced no evidence upon which a reasonable factfinder could conclude that any of the named Defendants formed an agreement to accomplish commit any acts, wrongful, or otherwise with respect to Mr. Shrewsbury. Accordingly, Defendants are entitled to summary judgment on Count VIII.

**9.      Counts IX and XI**

Counts IX and XI assert claims against the WVDCR and Defendant Wexford for negligent hiring and retention. [Doc. 1 at 24, 27].

The Supreme Court of Appeals has formulated the following standard for claims of negligent hiring or retention:

> [W]hen the employee was hired or retained, did the employer conduct a reasonable investigation into the employee's background vis a vis the job for which the employee was hired and the possible risk of harm or injury to co-workers or third parties that could result from the conduct of an unfit employee? Should the employer have reasonably foreseen the risk caused by hiring or retaining an unfit person?

*McCormick v. W. Va. Dep't of Pub. Safety*, 202 W. Va. 189, 193, 503 S.E.2d 502, 506 (1998). The analysis is the same in the case of an employee or an independent contractor. *See Thomson v. McGinnis*, 195 W. Va. 465, 465 S.E.2d 922 (1995).

With respect to Defendant Wexford, Ms. Smith presented no evidence that would permit a jury to find that Defendant Wexford was negligent in hiring or retaining any of its employees. There is no evidence that, at the time they were hired, Defendant Wexford knew or ought to have known that the employees involved in Mr. Shrewsbury's care had a history of misconduct or had engaged in prior bad acts. Likewise, there is no evidence that any employee involved in Mr. Shrewsbury's care had engaged in misconduct, known to Defendant Wexford prior to the events alleged herein, for which they should have been terminated. Accordingly, Defendant Wexford's motion for summary judgment as to the claims for negligent hiring and retention should be granted.

One the other hand, there is evidence that Defendant Johnson was dismissed from five separate "basic training" classes before the WVDCR forced to him resign. [Doc. 289-7 at 5].

Ms. Smith is entitled to the inference that basic training is integral to understanding the duties and expectations of a correctional officer, including the knowledge and skills necessary to respond appropriately to reports of inmate violence. And a reasonable jury could conclude that at the time Defendant Johnson was hired and retained, it was reasonably foreseeable that he would engage in the type of misconduct alleged in this case. Accordingly, the WVDCR's motion for summary judgment on Ms. Smith's state law negligent hiring and retention claims is **DENIED**.

### 10.    Count X

Count X charges Defendants the WVDCR and Defendant Wexford with negligent supervision and training. [Doc. 1 at 24–27].

Under West Virginia law, to state a claim for negligent supervision or training, a plaintiff must show that "the [employer] failed to properly supervise [or train its employee] and, as a result, [the employee] proximately caused the [plaintiff's] injury." *Taylor v. Cabell Huntington Hosp., Inc.*, 208 W. Va. 128, 135, 538 S.E.2d 719, 725 (2000). "[C]laims for negligent training or supervision cannot succeed absent an underlying claim for employee negligence." *Davis v. Dish Network, LLC*, No. 3:18-cv-1415, 2019 WL 5406241, at *8 (S.D.W. Va. Oct. 22, 2019).

First, the WVDCR contends the claim fails because Ms. Smith has not made "a showing of a negligence claim against a WVDCR employee . . . ." [Doc. 277 at 13]. This argument is unavailing at this juncture because, as discussed above, there is a genuine and material factual dispute respecting whether Defendants Radosevich and Johnson violated Mr. Shrewsbury's clearly established constitutional rights.

As to negligent supervision, Ms. Smith has adduced no evidence to causally link a lack of supervision to the alleged injuries. Ms. Smith's expert opined, "The [WVDCR] and SRJ

failed to have an adequate number of staff on duty to provide adequate supervision of the inmate population, which caused harm to Mr. Alvis Shrewsbury . . . ." [Doc. 289-7 at 6]. However, whether the WVDCR adequately supervised *its inmate population* is an issue separate and apart from a claim that the WVDCR negligently supervised *its employees*. And while there is some evidence that Sergeant Williams did not receive relevant training before being promoted to a supervisory position, Ms. Smith has failed show how any inadequate supervision by Sergeant Williams caused injury to Mr. Shrewsbury.

As to negligent training, however, for reasons discussed above, a reasonable jury could conclude that the WVDCR failed to ensure Defendant Johnson successfully completed his basic training requirements before entrusting him with overseeing its inmate population, and Defendant's Johnson lack of training was a proximate cause of injuries alleged herein. Accordingly, the WVDCR is not entitled to summary judgment on the claim.

As to Defendant Wexford, the Court finds a genuine and material factual dispute as to whether employees were negligently trained and whether the alleged negligent training caused Mr. Shrewsbury's death. There is evidence that Wexford employees were inadequately trained on "Chest Pain Protocol" and that proper training could have altered the tragic outcome here. [*See* Doc. 290-3]. There is also evidence that Wexford employees lacked proper supervision the night Mr. Shrewsbury collapsed and died, and that sufficient supervision may have reduced the likelihood of Mr. Shrewsbury's death. [Doc. 290-4 at 3]. Accordingly, Defendant Wexford is not entitled to summary judgment on Count X.

**B.**    *Plaintiff Miranda Smith's Motion for Partial Summary Judgment*

Ms. Smith filed her own Motion for Partial Summary Judgment. [Doc. 280]. The Court concludes that genuine issues of material fact are extant. Consequently, Ms. Smith's Motion for Partial Summary Judgment [**Doc. 280**] is **DENIED**.

### IV.

Based upon the foregoing discussion, the Court **ORDERS** as follows respecting the pending motions:

1. The WVDCR Defendants' Motion for Summary Judgment [**Doc. 276**] is **GRANTED IN PART** and

   a. Counts II and VIII are **DISMISSED WITH PREJUDICE** in their entirety;

   b. Counts I, II, IV, VI, and VII are **DISMISSED WITH PREJUDICE** as to Defendants Burton and Toney; and

   c. Count III is **DISMISSED WITH PREJUDICE** as to Defendant Johnson.

2. The Wexford Defendants' Motion for Summary Judgment [**Doc. 284**] is **GRANTED IN PART** and

   a. Counts II, VIII, IX, and XI are **DISMISSED WITH PREJUDICE** in their entirety.

3. Plaintiff's Motion for Partial Summary Judgment [**Doc. 280**] is **DENIED**.

The Clerk is directed to send a copy of this written opinion and order to counsel of record and to any unrepresented party.

ENTER:    September 30, 2024

Frank W. Volk
Chief United States District Judge